**LEVY et al.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 14691.

United States Court of Appeals, Fifth Circuit.

May 6, 1954.

R. D. Maxwell, Jr., David S. Batcheller, Smathers, Thompson, Maxwell & Dyer, Miami, Fla., for appellants.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Kenneth W. Gemmill, Acting Chief Counsel, John M. Morawski, Sp. Atty., Robert N. Anderson, Alonzo W. Watson, Jr., Sp. Asst. Attys. Gen., Washington, D. C., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a decision of the Tax Court, disallowing a deduction claimed by petitioners, Arnold Levy and his wife Louise B. Levy, in their income tax for the year 1946. The petitioners were partners in an antique furniture and jewelry business in Miami Beach, Florida, where they had occupied the same building since 1929, when it was erected especially for them by the owner, Calvin Bentley, under whom they held by virtue of successive five-year leases. On April 30, 1945, Bentley leased the property to petitioners for a term of five years beginning September 1, 1945, at a total rental of $25,000, payable $5000 per annum. In addition to the rental payments, and as a part of the consideration of the lease, petitioners were to pay all taxes on the leased premises and to carry insurance on the building. The lease provided that, in the event the building should be destroyed or rendered untenantable by any casualty during the term of said lease, the lessor should have the option to terminate the lease or to repair the damaged premises. Notice of the lessor's option was to be given the tenants in writing within ninety days after the date of such damage or destruction. The lease provided further that the tenants should make any and all repairs to the building at their own expense, but that they should remove no partitions and make no changes in the interior arrangement, decoration, or construction of said building without the consent of the landlord. The lease specifically provided that the term "all repairs" should not be construed as requiring the tenants to rebuild the roof or walls or to replace rafters or to make similar major repairs.

For several years prior to 1946 there had been a noticeable sag in the center of the forty-foot trusses that supported the roof of the building, and the plaster boxing around the main beams had a tendency to crack open. At the time the lease was executed in April, 1945, all parties knew that the roof was in need of repairs, but the extent thereof had not been determined. In May, 1946, the roof began to leak, and an inspection by a general contractor disclosed that the central portion of the roof had sagged to such an extent that a depression was created in which rain water accumulated; that the roof was weak; and that one supporting beam had cracked to such an extent that the contractor had to shore it up with eight by eight supports to prevent the roof from collapsing. Thereupon, Arnold Levy notified Bentley of the condition of the roof, and Bentley told him to go ahead and see what work had to be done and to attend to having the roof repaired. Shortly thereafter, Bentley instructed Levy to go ahead and handle the whole job. Levy then asked if he (Levy) should pay the bills and be reimbursed by Bentley, and the latter told him not to pay any bills but to send them to the Detroit Trust Company, Detroit, Michigan, which company would pay the bills as they became due.

Levy undertook to determine the extent of the repairs and replacements that were needed, and was informed that the condition of the roof was such as to make the building unsafe for use. The taxpayers then moved out of the building while the work was being done. After receipt of the first bill, in the sum of $6000, Bentley, who had returned to Detroit, wrote a letter to Arnold Levy in which he expressed surprise that the cost of fixing the roof "was running $12,000.00 or more," and stated that Levy should not have obligated him for such an amount without taking the matter up with him; that he thought the cost of fixing the roof was out of reason since it amounted to a sum equal to half

the original price of the building, which was $23,000. A few days later, in reply to a letter from Levy, Bentley stated that he still felt that $12,000 was too much, but that he would pay the bills and that he had never intimated otherwise; and he closed his letter with the repeated request that the bills be sent to the Detroit Trust Company when they were all in.

Since Levy was anxious to have the work completed as soon as possible, so that he could move back into the building, he paid all bills, as the work progressed, until completion of the job in October, 1946. The total sum expended by him was $21,721.91, for which he received no reimbursement, though Bentley had been duly notified. Levy also wrote the Detroit Trust Company late in December, 1946, expressing his desire for a quick settlement of the amount Bentley owed him, but there is no evidence that he received any reply from the company.

During the time that the building was being repaired, Levy was negotiating for the purchase of the leased premises, and on January 2, 1947, Bentley sold him the property for $120,000, making no deduction for the amount expended by Levy in having the building repaired. On their partnership income tax return for 1946, petitioners claimed a deduction of $21,721.91, explaining that that amount had been expended in order to protect the business from damage caused by a sudden casualty to the premises in which the taxpayers did business, and for which expenditure they had not been reimbursed; that the amount was paid in lieu of litigation; and, also, that the said amount was being deducted as a disbursement, the benefit therefrom being extinguished upon cancellation of the lease.

The Commissioner disallowed the deduction, and the Tax Court in sustaining the ruling of the Commissioner, held that there was no factual basis for allowing the deduction, either as a business expense because of emergency repairs, an expense to protect the business, a casualty loss, or an expenditure the benefit of which was extinguished upon cancellation of the lease. The Tax Court based its opinion upon the finding of fact that the expenditures were for capital improvements, for which the owner was obligated to pay but which the petitioner had volunteered payment with the expectation of reimbursement. The question thus presented is whether the Tax Court's factual determinations are clearly erroneous.

We think that the conclusion of the Tax Court is amply supported by the evidence. The conversations and the letters between Levy and Bentley show that both understood, as the lease provided, that the latter, as owner of the premises, was obligated to have the work done, and that, although the petitioners paid the bills, all parties understood that Bentley was obligated to reimburse them. Bentley never repudiated his obligation, and the evidence fails to establish the fact that the taxpayers could not have enforced their right to reimbursement. It is well settled that expenses for which there exists a right of reimbursement are not ordinary and necessary business expenses within the meaning of Section 23(a)(1) of the Internal Revenue Code, 26 U.S.C.A. Glendinning, McLeish & Co. v. Commissioner, 2 Cir., 61 F.2d 950; All Russian Textile Syndicate v. Commissioner, 2 Cir., 62 F.2d 614; Universal Oil Products v. Campbell, 7 Cir., 181 F.2d 451.

The amount expended by the petitioners is also excluded from deductions as an expense of current business operations, because said expenditure was for capital improvements. The complete encasement of the wooden trusses in steel plates, recovering and replacing a large portion of the roof, the installation of new flooring, and the construction of new interior features, materially added to the value of the property and prolonged its useful life. Section 24(a)(2) of the Internal Revenue Code, and Section 29.23(a)–4 of Treasury Regulations 111.

Clearly there was no casualty loss, because the evidence fails to show that the deflection of the roof-supports was occasioned by any sudden unexpected, or unusual event similar to a storm, fire, or shipwreck. On the contrary, the evidence discloses that petitioners and Bentley were aware of the defective condition of the roof prior to the date on which the final lease was executed. Matheson v. Commissioner, 2 Cir., 54 F. 2d 537; Fay v. Helvering, 2 Cir., 120 F. 2d 253; Section 23(e)(3) of the Internal Revenue Code. The decision of the Tax Court is affirmed.

Affirmed.